*Kent v. R.L. Vallee, Inc. et al.*, No. 617-6-15 Cncv (Toor, J., May 6, 2016).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| JACOB R. KENT, et al.,<br> Plaintiffs<br><br>v.<br><br>R.L. VALLEE, INC., et al.,<br> Defendants | Docket No. 617-6-15 Cncv |

RULING ON DEFENDANTS' MOTION TO DISMISS

In this class action, plaintiffs allege price-fixing by defendants, who are wholesale and retail sellers of unleaded gasoline in Chittenden, Franklin, and Grand Isle counties. Specifically, plaintiffs claim violations of the Vermont Consumer Protection Act (VCPA) (9 V.S.A. § 2453) as to wholesale gasoline (Count I) and retail gasoline (Count II), as well as unjust enrichment (Count III). Defendants have moved to dismiss pursuant to V.R.C.P. 12(b)(6), and also on statute of limitations grounds. Each defendant has filed a separate motion to dismiss, with generally overlapping arguments.

PLAINTIFFS' ALLEGATIONS

The following facts are alleged by plaintiffs in their complaint.[1] The court makes no findings as to their accuracy.

Plaintiffs bring this action individually and on behalf of the class, which consists of Vermont citizens and businesses who purchased unleaded gasoline at retail gasoline stations in

---

[1] Throughout this decision, "complaint" or "compl." refers to plaintiffs' First Amended Complaint, filed on July 30, 2015, unless otherwise indicated.

Chittenden, Franklin, and Grand Isle counties (the "class area") during the class period (January 1, 2005 through the present). Compl. ¶ 2. The defendants are four Vermont corporations: R.L. Vallee, Inc., S.B. Collins, Inc., Champlain Farms/Wesco, Inc., and Champlain Oil Company, Inc. Id. ¶ 1.

Average retail gasoline prices in the class area have been inexplicably and persistently higher than elsewhere in the state—such as Middlebury and Rutland—and other areas of the Northeast and the United States. Id. ¶ 5. Defendants' gross wholesale and retail profits have periodically been: (1) twice the national average; (2) second highest out of 450 gasoline markets measured in the country; and (3) highest within New England. Id. Plaintiffs claim the high prices and profits are the result of a price-fixing agreement among defendants. *See* id. ¶ 34.

The class area contains a highly concentrated wholesale and retail gasoline market. Defendants collectively own or control at least four of the six meaningful gas suppliers, a 67% market share, and at least 64% of all class area gas stations. Additionally, defendants own and lease back gas pumps at several independently owned stations. Thus, defendants control wholesale pricing and as a result retail pricing at their stations and at several independent stations, with those stations passing on defendants' wholesale prices to consumers. Id. ¶ 6.

Several phenomena persist in the class area and during the class period that generally do not exist in competitive, non-collusive markets. One example alleged by plaintiffs is that defendants' wholesale and retail prices have been nearly identical, and the stations supplied by defendants have adjusted retail prices in direct relation to defendants' wholesale prices. Id. ¶¶ 7, 60–62. More specifically, defendants' wholesale prices have increased and decreased by the same or similar amounts on the same days. Id. ¶ 61. Likewise, retail prices at defendants' stations and stations they supply in the class area (over 100 stations) moved virtually in lockstep. Id. ¶ 62.

2

During the class period, S.B. Collins typically sold gas at its Chittenden County station two cents above prices at Champlain Oil and Wesco stations, and three cents above stations owned by R.L. Vallee. Id. ¶ 71. This suggests, plaintiffs allege, that retail prices at Chittenden County stations were simply following collectively fixed wholesale prices. Id. Defendants directly charged a higher price to the independently owned gas stations they supplied, forcing them to charge higher prices to the class. Id. ¶¶ 72–73. If a co-conspirator had an incentive to take market share and profits by lowering its price, the other defendants could simply threaten to lower wholesale prices, thus reducing retail prices and "enforc[ing] the terms of the cartel." Id. ¶ 73.

Market prices often have not been logically related to terminal rack costs.[2] Market prices have: (1) increased or remained unchanged in times of declining cost, (2) increased when costs have not changed, and (3) decreased at a disproportionately smaller amount and pace than the decline in costs. Id. ¶ 7. Specifically, plaintiffs allege that from 2010 to 2015, there were six distinct periods of declining terminal rack prices, where defendants increased the price spread between Chittenden County and Rutland. Id. ¶ 69. The average time span of the six distinct periods was 94 days, including one 210-day span where the price spread quadrupled. Id.

Defendants have earned outsized gross profits, often in the top 10 of 450 gasoline markets measured in the United States. Id. ¶ 7. Defendants were able to achieve "abnormal and exorbitant" profits on the sale of gasoline within the class area. Id. ¶ 63. Their profit margins exceeded the margins realized by comparable gas stations outside of the class area within comparative markets in Vermont and throughout the United States. Id. ¶ 64. The Oil Price Information Service, a company that tracks the terminal and retail prices of gasoline throughout the country, found that

---

[2] "Terminal rack cost" refers to the price at which defendants acquire gasoline. Compl. ¶ 7.

the Burlington area was the most profitable gasoline market for retailers in the northeast United States and often in the top ten nationwide. Id. ¶ 8.

Defendants have maintained their wholesale and retail market shares despite numerous opportunities to compete on price to acquire market share. Id. ¶ 7. In competitive markets and during periods of declining costs, profit-motivated competitors would typically decrease prices to take more market share. Id. ¶ 67. However, that did not happen among defendants during the class period and within the class area. Id.

Defendants have frequently acquired real property on which they have imposed deed restrictions barring future use as gas stations to further limit competition or dilution of market share. Id. ¶ 7. Additionally, defendants have used Vermont environmental laws to obstruct the entry of low-cost gasoline providers and to extract unreasonable covenants that prevent or limit competition. Id.

With regard to those barriers to entry, plaintiffs allege two examples within the class area. First, in 2010 R.L. Vallee opposed Walmart's bid to build a discount store in Franklin County until it was written into the permit that "there shall be no sale of gasoline for automobiles." Id. ¶ 50. Second, R.L. Vallee has partnered with Wesco since 2007 to oppose Costco's plans to build a filling station in Colchester, Vermont. Id. ¶ 51. The entry of Costco into the market "would have meant the addition of a major low cost player acting outside of the cartel." Id. Plaintiffs allege three additional examples, all of them outside of the class area. Two involved deed and permitting restrictions at gas stations in Plainfield in 2012 and 2013–2014, while the other involved the closing of a gas station in St. Johnsbury in 2014. See id. ¶¶ 52–54.

When confronted by federal and state elected officials, Defendants have given pretextual or plainly false explanations for their pricing behavior, such as claiming they did not make a profit,

4

or that they lost money on gasoline for substantial periods within the class period. Id. ¶¶ 7, 75, 80–81. While the issue at the legislative hearings was why a certain area of Vermont had higher prices than elsewhere in the state, defendants tried to confuse the issue by interjecting: (1) factors that apply throughout Vermont; (2) irrelevant comparisons between Vermont and other states; and (3) other "nonsensical red-herrings" that could not have explained the high price of gasoline within the class area. Id. ¶ 82. This was a "blatant attempt at misdirection" to conceal ongoing price coordination. Id. ¶ 83.

The proffered justifications for high gas prices provided by defendants at the hearings included freight differences, the high cost of living in Vermont, high terminal costs, fluctuation in wholesale price with limited turnover, overhead which can vary from location to location, labor costs, environmental compliance, repair costs, health insurance, utility costs, credit card fees, cost of crude available in Vermont, law enforcement authority reluctance to pursue people stealing gas, property taxes, costs to build gas stations and replace underground storage tanks, variable sales volumes, amenities such as hot coffee and made-to-order food, and clean bathrooms with fresh flowers. Id. ¶¶ 84–85. Additionally, the R.L. Vallee CEO gave an "irrelevant speech" about alleged environmental violations of a possible competitor, and how much his company is appreciated in the community. Id. ¶ 86. The hearing testimony summarized above, plaintiffs allege, does not explain the high price of unleaded gasoline in the class area, and only further demonstrates that defendants engaged in a price-fixing conspiracy. Id. ¶¶ 75, 80–87.

Additionally, the Federal Trade Commission concluded that gas prices in the greater Burlington area in late June 2012 were 10 to 43 cents a gallon higher than the FTC's computer model predicted they should be. Id. ¶ 9. Plaintiffs allege further evidence of collusive behavior in that defendants temporarily reduced their prices and profit margins before August 2012 and

January 2013 legislative hearings investigating high gas prices in northwestern Vermont. Id. ¶ 74. These price reductions were executed despite rising costs for the purpose of masking illegally high prices charged at all other times, and demonstrates that defendants had control of the market. Id.

Plaintiffs allege that this evidence "does not support the possibility of innocent, independent pricing decisions" and "instead points directly to an extensive price-fixing scheme of long duration" perpetrated by defendants. Id. ¶ 15. More specifically, plaintiffs allege, the facts and data show that: (1) defendants agreed to set their wholesale prices at nearly identical levels to maintain retail prices at virtually all stations in the class area at illegally high levels; (2) defendants agreed to increase, decrease, and maintain their prices at or near the same time and by the same amount; (3) defendants' wholesale price-fixing directly inflated prices both at their stations and at the independent stations they supply; and (4) the class paid illegally inflated prices at defendants' stations and at the stations they supply. Id. Plaintiffs allege defendants might have pilfered over $100 million from the class during the class period. Id. ¶ 16.

In sum, "[p]laintiffs allege that during the Class Period, Defendants conspired to fix, raise, maintain, and/or stabilize unleaded gasoline prices being charged at wholesale and to all Vermont citizens who purchased gasoline in the Class Area. Because of Defendants' unlawful conduct, Plaintiffs paid artificially-inflated prices for unleaded gasoline, and, as a result, suffered monetary damages." Id. ¶ 34.

In the complaint, plaintiffs allege that defendants discussed and formed their anticompetitive agreements during "secret meetings and conversations, often conducted at undisclosed, out-of-the-way locations." Id. ¶ 79. However, during oral argument, plaintiffs retreated from their "secret meeting" allegation, instead relying on their assertion that defendants

6

had the *opportunity* to meet. *See* Tr. of Hr'g on Mots. to Dismiss at 43–44; Compl. ¶ 59.[3] Specifically, the complaint alleges such opportunities through membership in the Vermont Petroleum Association by all defendants, which convened regular trade association meetings and more informal events like an annual golf tournament which "some or all of the [d]efendants" might have attended. Id. Plaintiffs also allege that the fact that defendants collectively agreed to one agent for representation at legislative hearings in 2012, 2013, and 2015, further demonstrates such opportunity to meet. *See* id.

Plaintiffs allege that they did not discover their cause of action earlier than immediately before the filing of this lawsuit because of defendants' fraudulent concealment of their conspiracy. Id. ¶ 89. Thus, plaintiffs assert the tolling of the statute of limitations. Id. ¶ 91.

## DISCUSSION

### I.     Statute of Limitations

First, the court addresses the statute of limitations issue raised by Champlain Oil and Wesco. Those defendants contend the six-year statute of limitations has run because the class period started in 2005, and plaintiffs were in possession of enough facts to pursue and investigate their claim at that point. Plaintiffs' complaint alleges that despite due diligence during the class period, plaintiffs did not and could not discover their cause of action until immediately before the filing of this lawsuit in 2015 due to defendants' fraudulent concealment. Compl. ¶¶ 76–91.

In their opposition memo, Plaintiffs argue that the conspiracy was discovered in 2012. *See* Pl.'s Opp'n to Defs.' Mots. to Dismiss at 16 n.8 (filed Nov. 2, 2015). They also argue that the statute of limitations issue cannot be resolved on a motion to dismiss, arguing that this is a fact-intensive question that must be resolved by a jury. Id. While it is true that disputed facts regarding

---

[3] In a separate order, the court is today granting defendants' motion to strike paragraph 79 of the complaint, which had alleged the secret meetings. Thus, the court treats paragraph 79 as deleted.

the time of discovery must go to a jury, plaintiffs are still required to *plead* facts that, if proved, would establish their tolling claim.

Defendants contend that discovery of the alleged conspiracy occurred simply by reviewing publicly available pricing data from 2005 and concluding that it amounted to a conspiracy. Thus, defendants argue, plaintiffs were on inquiry notice because the pricing data existed for years before the statute of limitations ran, and they point to no fact discovered in 2012 that could not have been discovered earlier. Retail gas prices are publicly posted on large signs, and public hearings were held regarding gas prices. Defendants further argue that by alleging no facts that would support a claim or inference of fraudulent concealment, plaintiffs fail to satisfy the heightened pleading standard for fraud contained in Rule 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

"If properly pleaded, fraudulent concealment can vitiate the statutory bar of the limitations defense." Fercenia v. Guiduli, 2003 VT 50, ¶ 14, 175 Vt. 541 (citing S. Burlington Sch. Dist. v. Goodrich, 135 Vt. 601, 606 (1977)). The Vermont Supreme Court has applied the same pleading rule in cases where the fraud is pled to avoid the statute of limitations rather than as a separate, affirmative claim. Id. ("Allegations of fraud . . . must be pled with particularity."); Standard Packaging Corp. v. Julian Goodrich Architects, Inc., 136 Vt. 376, 380–81 (1978); *see also* In re Elec. Carbon Products Antitrust Litig., 333 F. Supp. 2d 303, 315 (D.N.J. 2004) (plaintiffs seeking to toll statute of limitations based on defendant's fraudulent concealment must allege underlying acts of fraudulent concealment with particularity as required by heightened pleading standard for fraud claims); Boland v. Consol. Multiple Listing Serv., Inc., 868 F. Supp. 2d 506, 518 (D.S.C. 2011); Doe v. Order of St. Benedict, 836 F. Supp. 2d 872, 877 (D. Minn. 2011).

8

In the antitrust context, courts have generally held that a plaintiff must allege three elements of fraudulent concealment to avoid the statute of limitations: (1) affirmative acts by defendant to fraudulently conceal its conduct, (2) failure of plaintiff to discover the facts forming the basis of its claim within the limitations period, and (3) plaintiff's exercise of due diligence in attempting to discover those facts. State of N.Y. v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988); In re Ciprofloxacin Hydrochloride Antitrust Litigation, 261 F. Supp. 2d 188, 222 (E.D. N.Y. 2003); In re Nine West Shoes Antitrust Litigation, 80 F. Supp. 2d 181, 192 (S.D. N.Y. 2000); J. Miles, 1 Health Care and Antitrust L. § 9:10 n.32 (2016) (listing cases).

With respect to the first element, price-fixing and bid-rigging are considered "self-concealing" conspiracies, whose natures are "inherently secret." Miles, 1 Health Care and Antitrust L. § 9:10 and n.35 (listing cases). Thus, merely alleging a price fixing conspiracy is sufficient as to that element, and plaintiffs need not plead that defendants took independent, affirmative steps of concealment. *See* Hendrickson Bros., 840 F.2d at 1083–84; Hinds Cty., Miss. v. Wachovia Bank N.A., 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009); Nine West Shoes, 80 F. Supp. 2d at 193.

As to the second element, plaintiffs have pled that they "did not discover their cause of action until immediately before the filing of this lawsuit because [d]efendants' fraudulent concealment of their conspiracy was effective." Compl. ¶ 89. Some federal cases have found such allegations insufficiently particular under Rule 9(b). In Hinds, the plaintiffs failed to plead the second prong of fraudulent concealment where they alleged that "Plaintiffs and the Class members did not discover . . . that Defendants and their coconspirators were violating the antitrust laws until shortly before this litigation was commenced." 620 F. Supp. 2d at 520. The complaint in Hinds did "not specify when any Named Plaintiffs or Class members became aware of the antitrust violations, and therefore [did] not state 'with particularity the circumstances constituting fraud or

9

mistake.'" Id. (citing F.R.C.P. 9(b)); *see also* In re Magnetic Audiotape Antitrust Litig., No. 99 Civ. 1580, 2002 WL 975678, at \*3 (S.D.N.Y. May 9, 2002) (allegation that knowledge about the alleged antitrust violation "was obtained 'shortly before April 1999' is very vague. Such a general allegation, without more, fails to satisfy the second prong of the fraudulent concealment test.").

Plaintiffs' allegations of the second element of fraudulent concealment is similar to the Hinds allegation, which that court found insufficient. Vermont case law suggests the same conclusion. In a case involving an action for damages resulting from the collapse of portions of a building, the plaintiffs[4] alleged negligent installation of steel structural supports for the building's roof and sprinkler system. *See* Standard Packaging Corp. v. Julian Goodrich Architects, Inc., 136 Vt. 376, 377–78 (1978). The complaints charged that the defendants "'actively concealed' the defective work, which 'was not apparent to [plaintiff] in the exercise of reasonable diligence and was a latent rather than a patent defect.'" Id. at 378. The complaints also stated that the defective construction was discovered only when the building's roof collapsed. Id. The Supreme Court held that these allegations were sufficient to raise the issue of fraudulent concealment and bring the complaint within the applicable six year limitations period. Id. at 381.

In Standard Packaging, the complaint pled when and how plaintiff discovered the cause of action. In contrast, plaintiffs here have alleged merely that they "did not discover their cause of action earlier than immediately before the filing of this lawsuit." Compl. ¶ 89. This does not rise to the level of pleading with particularity under Rule 9(b). Plaintiffs do not state exactly when they discovered the cause of action, even though such information is presumably based on their actual knowledge and readily available.

---

[4] The plaintiffs in Standard were actually third-party plaintiffs, the complaints third-party complaints, and defendants third-party defendants. However, this court refers to them as plaintiffs, complaints, and defendants for ease of discussion.

10

As to the third element, plaintiffs pled that although they "exercised due diligence" during the class period, they "could not have discovered the self-concealing . . . conspiracy at an earlier date" because of defendants' fraudulent concealment. Compl. ¶ 90. In Hinds, the court found the allegations as to the third element insufficient to satisfy Rule 9(b). There, the plaintiffs did not allege that they performed any kind of due diligence, only that "Plaintiffs and Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and affirmatively conceal their violations." 620 F. Supp. 2d at 521–22. The court concluded that a "brief reference to 'reasonable diligence,' coupled with general allegations of secrecy and deception directed towards the first prong of fraudulent concealment," was not enough.[5] Id. at 522; *see also* Nine West Shoes, 80 F. Supp. 2d at 193 ("Plaintiffs must plead due diligence with specificity.").

This court finds the Hinds analysis persuasive under the heightened pleading standard for fraud. Here, plaintiffs do not provide any detail as to how they exercised due diligence. They do

---

[5] The Hinds court observed that the case law regarding the third prong is "not entirely consistent":

> The third prong has been characterized as requiring a showing that the plaintiff's ignorance of the claim "was not the result of lack of diligence," Hendrickson Bros., 840 F.2d at 1083. It has also been characterized as a requirement that a plaintiff show "due diligence in pursuing discovery of the claim," National Group, 420 F.Supp.2d at 265; *see also* Merrill Lynch, 154 F.3d at 60.

620 F. Supp. 2d at 522. Finding the first formulation "problematic" because it "allows the allegations required to satisfy the first prong of fraudulent concealment to also satisfy the third prong" and "is difficult to characterize . . . as pleading with particularity," the Hinds court noted that it agreed with other courts that in this context, "[g]eneral assertions of ignorance and due diligence without more specific explanation . . . will not satisfy the[ ] pleading requirements." Id. (alterations in original). Thus, "[d]ue diligence is not adequately pled if plaintiffs 'did not allege in the [complaint] that they exercised due diligence' or if they 'make no allegation of any specific inquiries of [defendants], [or] detail when such inquiries were made, to whom, regarding what, and with what response.'" Id. (quoting Merrill Lynch, 154 F.3d at 60) (alterations in original).

not state whether they discovered their cause of action from retail prices alone, or examination of retail prices together with wholesale prices and profits after a particular investigation, or through some other means. Without any particularity, plaintiffs cannot rely on the fraudulent concealment exception to avoid the statute of limitations.[6]

However, plaintiffs' failure to plead fraudulent concealment with particularity does not doom their entire action. The statute of limitations excludes only that portion of the class period before the six-year period immediately prior to the filing of the lawsuit. Plaintiffs do not allege merely a single agreement that took place in 2005 or a conspiracy that ended more than six years before the suit was filed. Rather, they allege an on-going price-fixing conspiracy between 2005 and 2015. The allegations as a whole, if sufficient to suggest a price fixing conspiracy, would place that conspiracy—at least in part—during the limitations period.

The original complaint in this suit was filed on June 22, 2015. Therefore, any alleged conspiratorial acts or injuries which occurred prior to June 22, 2009 are time-barred.[7]

---

[6] Plaintiffs' attorney described their investigation in some detail at oral argument. *See* Tr. at 37–41. However, that is irrelevant if not pled in the complaint.

[7] At oral argument, plaintiffs also claimed that the alleged price-fixing constitutes a "continuing violation," and that that saves the entire class period from the statute of limitations. Tr. at 51. It is far from clear that the "continuing violation" theory would save the entire class period. *See* Klehr v. A.O. Smith Corp., 521 U.S. 179, 189–90 (1997) ("Antitrust law provides that, in the case of a 'continuing violation,' say, a price–fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.,* each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.' But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.") (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b, p. 145 (rev. ed.1995)) (citations omitted); Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 502 n. 15 (1968); Morton's Mkt., Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 827–29 (11th Cir. 1999); Hinds, 620 F. Supp. 2d at 519. In any event, this issue was not addressed in the pleadings or the briefs. Therefore, the court will not consider it.

## II.   First Amendment Protected Activity

Some of the conduct alleged by plaintiffs includes lobbying, permitting activity, and testimony before public hearings. The parties agree that this activity cannot form the basis of an antitrust violation under the Noerr-Pennington doctrine. *See* Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993) ("Those who petition government for redress are generally immune from antitrust liability.") (citing Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961)); Mine Workers v. Pennington, 381 U.S. 657, 669 (1965)). However, as plaintiffs correctly observe, evidence of such activity might be admissible to demonstrate the purpose and character of the alleged conspiracy. Pennington, 381 U.S. at 670 n.3; *see also, e.g.*, Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island, 997 F. Supp. 2d 142, 163 (D.R.I. 2014) ("a plaintiff may properly include evidence of immune lobbying activity in its antitrust allegations insofar as that evidence serves to illustrate the context and motive underlying the alleged anticompetitive conduct"); Evans v. Lorillard Tobacco Co., 465 Mass. 411, 457 (2013) ("Here, the plaintiff did not allege at trial that Tisch's testimony before the congressional subcommittee was the basis of any of the plaintiff's claims. Rather, portions of Tisch's testimony were offered as evidence in support of these claims.").

Thus, the court will consider below plaintiffs' allegations of defendants' lobbying, permitting activity, and testimony not as a basis for the claimed violation, but to the extent that those activities provide factual support for the price-fixing claim.

## III.    The Pleading Standard

The crux of the motions to dismiss is whether plaintiffs have adequately pled a price-fixing conspiracy by defendants so as to avoid dismissal for failure to state a claim. However, a preliminary inquiry deals with the pleading standard itself.

The burden on plaintiffs under Vermont law is "exceedingly low" at the pleading stage. Prive v. Vermont Asbestos Group, 2010 VT 2, ¶ 14, 187 Vt. 280. Motions to dismiss for failure to state a claim are "disfavored and should be rarely granted." Bock v. Gold, 2008 VT 81, ¶ 4, 184 Vt. 575. Complaints are intended to give enough notice to the defendant to allow a response, but need not lay out every detail of the facts supporting the claim. *See* Colby v. Umbrella, Inc., 2008 VT 20, ¶ 13, 184 Vt. 1 ("The complaint is a bare bones statement that merely provides the defendant with notice of the claims against it."). As our Supreme Court has noted, the goal is to "strike a fair balance, at the early stages of litigation, between encouraging valid, but as yet underdeveloped causes of action and discouraging baseless or legally insufficient ones." Id.

The U.S. Supreme Court has rejected the federal standard on which Colby was based, finding that the "no set of facts" language had "puzzl[ed] the profession for 50 years" and had "earned its retirement." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 562–63 (2007). Instead, Twombly speaks of pleading sufficient facts to make the plaintiff's claims not just possible, but "plausible." Id. at 556, 570. The decision is confusing, as it seems at times to be creating a "more likely than not" standard, yet denies it is doing so. Id. at 556–57; *see also* In re Text Messaging Antitrust Litig., 630 F.3d 622, 629 (7th Cir. 2010) (observing that Court's explanation of plausibility standard is "a little unclear," but perhaps is best described as "a nonnegligible probability that the claim is valid[.]"). The Twombly standard, the Court later explained, is "not akin to a 'probability requirement.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

One defendant (S.B. Collins) argues in its briefings that the court should adopt Twombly's "plausibility" pleading standard for antitrust cases in Vermont.[8] Twombly held that stating an antitrust claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." 550 U.S. at 556. Therefore, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." Id. at 556–57.[9] Adopting the Twombly standard, defendant argues, would alleviate concerns about expensive and expansive discovery that is unique to antitrust cases. *See* id. at 558–89.

The Vermont Supreme Court has twice declined to adopt Twombly's pleading standard. *See* Colby v. Umbrella, Inc., 2008 VT 20, ¶ 5 n.1, 184 Vt. 1 ("[W]e . . . are in no way bound by federal jurisprudence in interpreting our state pleading rules. We recently reaffirmed our minimal notice pleading standard . . . and are unpersuaded by the dissent's argument that we should now abandon it for a heightened standard.") (citations omitted); Bock v. Gold, 2008 VT 81, ¶5 n.*, 184 Vt. 575 ("As we noted recently, our dissenting colleagues' reliance on [Twombly] is misplaced.").[10] S.B. Collins tries to distinguish those cases, noting that Colby involved a section 1983 discrimination claim by a disabled state employee, while Bock involved a civil rights suit

---

[8] This argument was not raised at oral argument, so it appears S.B. Collins has backed away from it. To the extent S.B. Collins still relies on that argument, the court addresses it here for clarification.

[9] "Hence, when allegations of parallel conduct are set out in order to make a[n antitrust] claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Twombly, 550 U.S. at 557.

[10] There is also considerable disagreement as to whether Twombly actually imposed a heightened pleading standard, or merely clarified the already existing standard under Conley v. Gibson, 355 U.S. 41 (1957). *See* Colby, 2008 VT 20, ¶ 5 n.1; id. ¶ 19 n.3 (Burgess, J., dissenting); Wright & Miller, 5 Fed. Prac. & Proc. Civ. §§ 1202, 1216 (3d ed.). It is not clear that the decision in Twombly would actually change the result in any pre-Twombly antitrust decisions involving motions to dismiss.

against DOC by a prisoner. In those cases, defendant argues, there was a much greater disparity of resources between the plaintiffs and the state, plaintiffs there had difficulty articulating their claims, and discovery was not overly burdensome. Thus, S.B. Collins argues that the Court's rationale is inapplicable here.

It is true that the Court has not addressed the question of whether there should be a higher pleading standard for antitrust cases. However, the Court has not rested its decisions on the type of cases it was considering. The Court has repeatedly rejected adoption of the heightened Twombly pleading standard, and has not indicated it would be appropriate in any different context. Moreover, even in federal court the Twombly standard is not a special standard for antitrust cases, but applies to all types of cases. *See* Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009). This court therefore has no basis for creating a special standard based upon the nature of this case. Whatever Twombly actually says about pleading, it is not the law in Vermont, and this court will not import its standards without explicit direction from our Supreme Court.

The court will address defendants' motions under the traditional Vermont pleading standard: whether "it appears beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." Davis v. American Legion, Dept. of Vermont, 2014 VT 134, ¶ 12 (quoting Alger v. Dep't of Labor & Indus., 2006 VT 115, ¶ 12, 181 Vt. 309); *see also* Prive v. Vermont Asbestos Grp., 2010 VT 2, ¶ 15, 187 Vt. 280 (the rule in this state is that when plaintiffs have not yet had an "opportunity to develop the case" through discovery, all that is required is a short and plain statement of the claim.) (internal quotation omitted). The court must take factual allegations in the complaint—though not legal conclusions—as true, and determine whether such facts could prove plaintiffs' case. Dernier v. Mortgage Network, Inc., 2013 VT 96, ¶ 23, 195 Vt. 113 ("We assume that all factual allegations pleaded in the complaint are true, accept as true all

16

reasonable inferences that may be derived from plaintiffs pleadings, and assume that all contravening assertions in defendant's pleadings are false.").

IV.     Price-Fixing Claims

Plaintiffs allege that defendants engaged in price-fixing in violation of the VCPA, which prohibits "[u]nfair methods of competition . . . and unfair or deceptive acts or practices in commerce . . . ." 9 V.S.A. § 2453(a). Only one significant Vermont antitrust decision is on point, in which the Supreme Court described price-fixing as follows:

> Proof of a price-fixing conspiracy need not be direct. While particularly true of price-fixing conspiracies, it is well recognized law that any conspiracy can ordinarily only be proved by inferences drawn from relevant and competent circumstantial evidence, including the conduct of the defendants charged. Parallel business behavior, although not itself illegal, is admissible circumstantial evidence from which the fact finder may infer agreement.
>
> [U]niformity of price may be and has been considered some evidence tending to establish an illegal agreement. Price uniformity among competitors does not, of itself, violate the antitrust laws, however. If it is the result of independently reached pricing decisions, the element of "agreement" necessary to establish an illegal price-fixing combination or conspiracy is absent. But it does permit an inference that the defendant's conduct stemmed from an agreement, tacit or express, rather than from independent business decisions.

State v. Heritage Realty of Vermont, 137 Vt. 425, 429–30 (1979) (quotations and citations omitted) (alteration in original).

Heritage involved a price-fixing claim against real estate brokers in violation of the consumer fraud act. In that case, the State's complaint alleged that during February 1977, most members of a county board of realtors attended a meeting where they voted to set the commission for residential real estate sales at seven percent, a change from the previous six percent. 137 Vt. at 427–28. The trial court granted summary judgment for defendants based on both parties' affidavits,

17

but the Supreme Court reversed, holding that plaintiff should have been allowed to further develop its case because its affidavits indicated that discovery might produce a genuine issue of material fact. Id. at 430.

By itself, Heritage does not resolve the exact issue here. It involved a summary judgment motion rather than a motion to dismiss. Further, the allegations of a meeting in the complaint were more specific than in this case. However, Heritage does provide guidance as to the type of evidence from which a price fixing conspiracy may be inferred. *See* id. at 429–30.

Plaintiffs urge the court to decide this motion solely based on Vermont law. However, there is insufficient guidance in Vermont law to determine the antitrust issues raised in this case.[11] The court must look to federal substantive antitrust law for guidance in construing the VCPA. *See* id. § 2453(b) ("It is the intent of the Legislature that in construing subsection (a) of this section, the courts of this State will be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act as from time to time amended by the Federal Trade Commission and the courts of the United States.");[12] Heritage, 137 Vt. at 429–30 (relying on federal antitrust decisions). Therefore, the court will be guided by substantive federal antitrust law

---

[11] As argued by plaintiffs, a literal reading of Heritage might suggest that an allegation of parallel pricing alone could be enough to survive a motion to dismiss. *See* Pls.' Opp'n at 2, 13–15; Heritage, 137 Vt. at 427–28 ("Parallel business behavior, although not itself illegal, is admissible circumstantial evidence from which the fact finder may infer agreement. . . . [U]niformity of price may be and has been considered some evidence tending to establish an illegal agreement."). However, given the citation in Heritage of federal law to the contrary, as well as the practical result of allowing any complaint alleging mere parallel business pricing to proceed to discovery, such a literal interpretation cannot possibly be what the Supreme Court intended.

[12] The statute refers to the Federal Trade Commission Act, 15 U.S.C.A. § 45, which prohibits "[u]nfair methods of competition . . . and unfair or deceptive acts or practices," and not the Sherman Act, 15 U.S.C.A. § 1, which prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade." *See* Elkins v. Microsoft Corp., 174 Vt. 328, 335–37 (2002). However, the U.S. Supreme Court has held that any violation of the Sherman Act also violates the FTC Act. California Dental Ass'n v. Fed. Trade Comm'n, 526 U.S. 756, 762 (1999) ("The FTC Act's prohibition of unfair competition and deceptive acts or practices, 15 U.S.C. § 45(a)(1), overlaps the scope of § 1 of the Sherman Act, 15 U.S.C. § 1, aimed at prohibiting restraint of trade . . . ."); Fed. Trade Comm'n v. Indiana Fed'n of Dentists, 476 U.S. 447, 454 (1986) ("standard of 'unfairness' under the FTC Act . . . encompass[es] . . . practices that violate the Sherman Act and the other antitrust laws"); Fed. Trade Comm'n v. Cement Inst., 333 U.S. 683, 689–95 (1948).

18

in determining what inferences may be drawn from what facts. Given the low pleading standard, however, if this case presents a close call, the court will err on the side of denying the motion to dismiss. Bock, 2008 VT 81, ¶ 4.

(1) Concious Parallelism and Plus Factors

It is well settled that conscious parallelism is not in itself unlawful. Heritage, 137 Vt. at 429–30; Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993); Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540–41 (1954). Conscious parallelism has been described as a "phenomenon of oligopolistic markets in which firms 'might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.'" White v. R.M. Packer Co., 635 F.3d 571, 575 (1st Cir. 2011) (quoting Brooke Grp., 509 U.S. at 227).[13] "Each producer may independently decide that it can maximize its profits by matching one or more other producers' price, on the hope that the market will be able to maintain high prices if the producers do not undercut one another." Id. Plaintiffs here do not argue that mere parallel behavior forms the basis for their claims, however.

---

[13] The First Circuit has defined an "oligopolistic market" as follows:

> "An oligopoly market is one in which a few relatively large sellers account for the bulk of the output." 2B Areeda, Hovenkamp, & Solow, Antitrust Law ¶ 404a, at 9 (3d ed. 2007). By contrast to a competitive market, in which no single producer has the power to affect the market price, in an oligopolistic market each of the major sellers can affect the market price by changing its output. By contrast to a monopolized market, "no one firm can unilaterally determine market price by varying its output" because rivals are large enough to affect the market price by doing the same. Id. at 10. As a result, "the distinctive characteristic of oligopoly is recognized interdependence among the leading firms: the profit-maximizing choice of price and output for one depends on the choices made by others." Id.

White v. R.M. Packer Co., 635 F.3d 571, 576 n.4 (1st Cir. 2011); *see also* E.I. du Pont de Nemours & Co. v. F.T.C., 729 F.2d 128, 139 (2d Cir. 1984) ("The mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws.").

Instead, they claim that the parallel behavior is one of several facts that together provide circumstantial evidence of an agreement among defendants to fix prices.

Because parallel pricing behavior may well be the result of independent, rational, and perfectly legal business conduct, plaintiffs must allege additional "plus factors" which suggest that the parallel pricing results from a price fixing agreement. *See* Apex Oil Co. v. DiMauro, 822 F.2d 246, 253–54 (2d Cir. 1987) (to infer a conspiracy from parallel pricing, "a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction[ ] with the parallel acts, can serve to allow a fact-finder to infer a conspiracy"); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 323 (3d Cir. 2010) ("plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor,' since plus factors are, by definition, facts that 'tend[ ] to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors.'") (quoting In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 (3d Cir. 2004)) (alteration in original). The plus factors serve to distinguish between behavior that results from an agreement and behavior that results from independent business conduct. Flat Glass, 385 F.3d at 360 ("plus factors" are "proxies for direct evidence of an agreement").[14]

Courts have disagreed over what constitutes a "plus factor" and how much weight particular plus factors should be given. The Third Circuit has observed that "[t]here is no finite set of such criteria; no exhaustive list exists." Id. However, that same court has broadly categorized

---

[14] Even under pre-Twombly antitrust law, an allegation of parallel conduct alone has never been enough to defeat a motion to dismiss. The Twombly dissent acknowledges this. *See* Twombly, 550 U.S. at 580 n.6 (Stevens, J., dissenting) ("For example, had the amended complaint in this case alleged *only* parallel conduct, it would not have made the required 'showing.' Similarly, had the pleadings contained *only* an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of 'bareness' with which the Federal Rules are concerned.") (citation omitted) (emphasis in original). There is no reason to suppose the Vermont Supreme Court would find a mere allegation of parallel conduct sufficient.

plus factors into three distinct groups: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) "evidence implying a traditional conspiracy." Id.

The first two factors can be problematic, the Third Circuit explained, because they "largely restate the phenomenon of interdependence." Id. But they are still "important to a court's analysis, because their existence tends to eliminate the possibility of mistaking the workings of a competitive market . . . with interdependent, supracompetitive pricing." Id. at 361; *see also* id. at 361 n.12 ("Neither factor is strictly necessary . . . nor sufficient to conclude that sufficient proof of an agreement exists to preclude summary judgment, but it is relevant and courts should as a general matter consider it.") (internal quotations omitted). With respect to the first factor, evidence that the defendant "had a motive to enter into a price fixing conspiracy" means "evidence that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion. In other words, it is 'evidence that the structure of the market was such as to make secret price fixing feasible.'" Id. at 360 (quoting In re High Fructose Corn Syrup Antitrust Litigation, 295 F.3d 651, 655 (7th Cir.2002)). As to the second factor, evidence that the defendant "acted contrary to its interests" means "evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." Id. at 360–61.[15]

The Third Circuit considered the third factor most important, and stated that it would "generally be non-economic evidence 'that there was an actual, manifest agreement not to compete." Id. at 361 (quoting High Fructose Corn Syrup, 295 F.3d at 661). "That evidence may

---

[15] "In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs. Put differently, in analyzing this factor a court looks to 'evidence that the market behaved in a noncompetitive manner.'" Flat Glass, 385 F.3d at 361 (quoting High Fructose Corn Syrup, 295 F.3d at 655).

involve 'customary indications of traditional conspiracy,' or 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" Id. (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1434b, at 243 (2nd ed.2000)); *see also* In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 321–22 (3d Cir. 2010).[16]

### (2) Plus Factors Alleged by Plaintiffs

Plaintiffs have alleged parallel pricing and a number of "plus factors" from which, they argue, one can infer a conspiracy among defendants to fix retail and wholesale gasoline prices in the class area. For purposes of organization, the court has categorized the allegations into three

---

[16] Courts and commentators have organized and described "plus factors" in numerous ways. For example, one commentator has outlined the "chief" plus factors as follows:

> • Actions contrary to each defendant's self-interest unless pursued as part of a collective plan.
> • Phenomena that can be explained rationally only as the result of concerted action.
> • Evidence that the defendants created the opportunity for regular communication.
> • Industry performance data, such as extraordinary profits, that suggest successful coordination.
> • The absence of a plausible, legitimate business rationale for suspicious conduct (such as certain communications with rivals) or the presentation of contrived rationales for certain conduct.

W. Kovacic, et. al., Plus Factors and Agreement in Antitrust Law, 110 Mich. L. Rev. 393, 405–06 (2011). Another commentator has written that the plus factor "most often considered" by courts in determining whether parallel behavior is the result of an agreement is the "business-justifications test." M. Vaska, Conscious Parallelism and Price Fixing: Defining the Boundary, 52 U. Chi. L. Rev. 508, 509 (1985). Under that test, "a price-fixing agreement may be inferred from parallel conduct if firms cannot show legitimate independent business reasons for engaging in such practices." Id. *See also* In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 907 (6th Cir. 2009) ("We concluded the following 'plus factors' were important when evaluating circumstantial evidence of concerted action: '(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire. Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct.'") (quoting Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1009 (6th Cir. 1999)); E.I. du Pont de Nemours & Co. v. F.T.C., 729 F.2d 128, 140 n.10 (2d Cir. 1984) ("The 'plus factor' may be conduct that is contrary to the defendants' independent self-interest, the presence or absence of a strong motive on a defendants' part to enter an alleged conspiracy, or the artificial standardization of products . . . .") (internal citations omitted).

22

broad groups based on how they are presented in the complaint: (1) product/market structure, (2) parallel pricing and behavior, and (3) barriers to entry.

i.     Allegations Concerning Product/Market Structure

As to the product, plaintiffs allege that unleaded gasoline is a necessary commodity, and no other fuel type is a substitute for such gasoline used in automobiles. *See* In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 657 (7th Cir. 2002) (Posner, J.) ("no close substitutes" for high fructose corn syrup). The demand for gasoline is highly inelastic and thus changes little in response to price changes. *See* White v. R.M. Packer Co., 635 F.3d 571, 582 (1st Cir. 2011) ("High barriers to entry and inelastic demand are two hallmarks of oligopolistic markets susceptible to successful parallel pricing practices, but neither helps to distinguish between agreement and mere conscious parallelism as the root cause of those practices.").

Regarding the geographic market, plaintiffs allege that gas stations and drivers that purchase gas (either through wholesale or retail) from defendants in the class area cannot reasonably and cost-effectively turn to areas of supply outside the class area. The cost and time of seeking gas from outside the class area outweighs any benefit from lower prices.

Plaintiffs also allege a highly concentrated market, where defendants have a 67 percent market share of the wholesale market, and own or control at least 64 percent of all class area gas stations. Compl. ¶ 6. Because of their control of the wholesale market, plaintiffs allege defendants also control retail pricing at independent stations. Id. Other courts have found that a highly concentrated market makes price fixing more feasible. *See* In re Text Messaging Antitrust Litig., 630 F.3d 622, 628 (7th Cir. 2010) (four defendants controlled 90 percent of text messaging market); Starr v. Sony BMG Music Entm't, 592 F.3d 314, 323–24 (2d Cir. 2010) (defendants controlled over 80% of digital music sold to end purchasers in U.S.); *see also* id. (citing 7 Phillip

R. Areeda and Herbert Hovenkamp, Antitrust Law § 1431a (2d ed. 2003) ("[E]mpirical studies considering many industries have suggested that noncompetitive pricing [that may be the result of price coordination] is likely to appear when the four leading firms account for some 50 to 80 percent of the market.") (alterations in original); High Fructose Corn Syrup, 295 F.3d at 656 (five defendants accounted for 90 percent of product sales).

However, a concentrated market, by itself, could also demonstrate mere parallel conduct in an oligopolistic market. As one court has observed:

> A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader. After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all. One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.

Reserve Supply Corp. v. Owens–Corning Fiberglas Corp., 971 F.2d 37, 53 (7th Cir.1992); *see also* In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 910 (6th Cir. 2009) (holding that each defendant's decision to match a new commission cut was arguably a "reasoned, prudent business decision"). Plaintiffs' allegations here about the product and the market structure make price-fixing feasible in the class market, but by themselves are not enough to defeat the motion to dismiss. [17]

### ii. Allegations Concerning Parallel Pricing and Behavior

Plaintiffs allege that retail prices in the class area are inexplicably and persistently higher than elsewhere in the State, such as Middlebury and Rutland, and other areas of the northeast and

---

[17] Champlain Oil also points out that defendants are only four of the six major gas wholesalers in the class area. The complaint does not explain why the other two wholesalers did not take market share by pricing at allegedly competitive levels. This, Champlain Oil contends, demonstrates that higher prices are more likely explained by conscious parallelism rather than a conspiracy to fix prices. However, this fact does not necessarily negate an inference of a price-fixing agreement. It is entirely possible that the two non-party wholesalers and/or those stations they supply independently imitated defendants' allegedly fixed prices. In any event, as the court has already stated, the fact of a concentrated market does not by itself suggest a price-fixing conspiracy.

the United States.[18] These prices have allegedly been nearly identical and moved in lockstep fashion among defendants. Further, they allege that defendants have earned "abnormal and exorbitant" gross wholesale and retail profits, often in the top 10 of 450 gasoline markets measured in the United States. Plaintiffs allege that no rational explanation has been offered for such high prices and profits.[19]

Of course, parallel pricing alone is insufficient to infer a price fixing conspiracy. Plaintiffs allege additional facts, some of which move them closer to a context that suggests a conspiracy. First, they allege that retail prices have not been logically related to terminal rack costs. According to plaintiffs, prices have repeatedly increased or remained unchanged in times of declining cost, increased when costs have not changed, and decreased at a disproportionately smaller amount and pace than the decline in costs. *See* Starr v. Sony BMG Music Entm't, 592 F.3d 314, 323–24 (2d Cir. 2010) (allegation that none of defendants reduced prices for Internet music despite dramatic

---

[18] Defendants argue that plaintiffs have not alleged that Rutland is an appropriate comparable market. Though plaintiffs' attorney stated at oral argument that both the class area and Rutland County are oligopolistic markets and insisted that plaintiffs had made that specific allegation in their complaint, *see* Transcript at 38:4–19, the complaint does not contain such a specific allegation. The closest the complaint comes to alleging that Rutland is a comparable market is in Paragraph 64 ("Profit margins realized by Defendants in the Class Area exceeded the margins realized by comparable gas stations outside of the Class Area within comparative markets in the State of Vermont and throughout the United States."), Paragraph 68 ("There is little justification for the price differential for gasoline between the Class Area and the City of Rutland. Major costs . . . vary little or not at all. To the extent some costs in Rutland are lower . . . , those difference cannot explain the price differential.) and in Paragraph 70 ("There is no competitive market explanation for the magnitude and substantial duration of the retail price differentials between Chittenden and Rutland during periods of declining costs."). However, this does not doom plaintiffs' complaint. There is a clear implication in the complaint of an apples-to-apples comparison. Moreover, the complaint alleges that the class area has higher prices than not only Rutland, but other areas of Vermont, the Northeast, and the country.

[19] With regard to parallel pricing behavior, defendants argue that the FTC document relied upon by plaintiffs in their complaint undercuts their allegations. Specifically, R.L. Vallee argues that the FTC data does not show excessive pricing or profit-taking, but instead shows that prices were within the predicted range for all but a few weeks. *See* Ex. A to R.L.'s Vallee's Reply. Indeed, the FTC data purportedly shows that from the period between January 2010 and June 2012, gas prices in Burlington, Vermont were within the "expected range" except for the last four weeks. *See* id. However, this is not the only allegation of parallel pricing behavior offered by plaintiffs. They allege unreasonably high retail prices, wholesale prices, and profits throughout the class period. Presumably, they will offer evidence supporting those allegations during discovery. The FTC chart covers only part of the class period. Furthermore, it is unclear from the chart exactly how the FTC determined the "expected range." The FTC chart does not meaningfully undermine plaintiffs' allegations.

cost reductions, taken together with other allegations, placed parallel conduct in context that suggested price-fixing agreement); In re Text Messaging Antitrust Litig., 630 F.3d 622, 628 (7th Cir. 2010) (Posner, J.) (complaint alleged that "in the face of steeply falling costs, the defendants increased their prices").[20]

Second, defendants have allegedly maintained their wholesale and retail market shares despite numerous opportunities to compete on price to acquire market share. Evidence of stable market shares suggests anticompetitive conduct, because such stability "is just what one would expect of a group of sellers who are all charging the same prices for a uniform product and trying to keep everyone happy by maintaining the relative sales positions of the group's members." High Fructose Corn Syrup Antitrust Litig., 295 F.3d at 659 (7th Cir. 2002); *see also* White v. R.M. Packer Co., 635 F.3d 571, 582 ("stable market shares over time may suggest in some factual contexts that the firms 'eliminated competition[] among themselves'") (quoting R. Posner, Antitrust Law 79 (2d ed. 2001)).

Third, and perhaps most damning to defendants, is the allegation that they temporarily reduced their prices and profit margins before August 2012 and January 2013 legislative hearings investigating high gas prices in northwestern Vermont, despite rising costs at the time. If true, as the court must assume for purposes of this motion, the timing is highly suspicious and suggests an agreement to temporarily reduce prices in order to mask high prices charged at other times. The fact that defendants did so despite rising costs—again, as the court must assume to be true—further suggests a conspiracy. *See* Starr, 592 F.3d at 323–24; Text Messaging, 630 F.3d at 628.

---

[20] As Judge Posner further explained, "[t]his is anomalous behavior because falling costs increase a seller's profit margin at the existing price, motivating him, in the absence of agreement, to reduce his price slightly in order to take business from his competitors, and certainly not to increase his price." Text Messaging, 630 F.3d at 628.

Plaintiffs also allege that defendants had the opportunity to meet and conspire through membership in the Vermont Petroleum Association, which held regular trade association meetings and an annual golf tournament. The court deems this to be of limited persuasive value in determining whether a conspiracy can be inferred from the allegations. Virtually any profession like that of defendants has a trade association which holds meetings and other events. Mere membership in the Vermont Petroleum Association demonstrates nothing. As other cases have demonstrated, something more—like specific dates and topics covered at meetings—is generally necessary for trade association membership or communications among defendants to be a plus factor. *Compare* Text Messaging, 630 F.3d at 628 (complaint sufficiently pled price-fixing where it alleged that, among other allegations, "defendants belonged to a trade association and exchanged price information directly at association meetings" and "met with each other in an elite 'leadership council' within the association . . . [whose] stated mission was to urge its members to substitute 'co-opetition' for competition"), Apex Oil Co. v. DiMauro, 822 F.2d 246, 255–58 (2d Cir. 1987) (reasonable inference could be drawn that notebook entries memorializing telephone conversations between defendants evidenced an agreement), *and* In re Static Random Access Memory (SRAM) Antitrust Litig., 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (where complaint cited specific email communications between defendants that suggested conspiracy, court noted that "allegations regarding [d]efendants' participation in various trade organizations . . . cannot alone support Plaintiffs' claims, but such participation demonstrates how and when [d]efendants had opportunities to exchange information or make agreements"), *with* Mayor and City Council of Baltimore v. Citigroup, Inc., 709 F.3d 129, 139–40 (2d Cir. 2013) (rejecting plaintiffs' allegation of "specific communications" between defendants where most communications alleged were internal to individual defendants, and the only two actual communications between competitors

were "vague references to isolated discussions among only three defendants"), *and* In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more.") (citing In re Citric Acid Litig., 191 F.3d 1090, 1098 (9th Cir.1999)).

That defendants collectively had one agent who represented them at legislative hearings is similarly unavailing. That a group of businesses would have common legislative interests does not support any untoward conspiracy.

One additional allegation offers further support for the inference of a conspiracy: that of defendants' "pretextual" or "plainly false" explanations for pricing behavior, consisting generally of testimony presented at legislative hearings conducted to investigate high gas prices in northwestern Vermont.[21] According to the complaint, defendants claimed they did not make a profit, or that they lost money on gasoline for substantial periods within the class period. Compl. ¶¶ 7, 75, 80–81. Defendants allegedly tried to confuse the issue at the legislative hearings by interjecting: (1) factors that apply throughout Vermont; (2) irrelevant comparisons between Vermont and other states; and (3) other "nonsensical red-herrings" that could not have explained the high price of gasoline within the class area. Id. ¶ 82. Plaintiffs allege this was a "blatant attempt at misdirection" to conceal ongoing price coordination. Id. ¶ 83.

Defendants proffered several justifications for high gas prices at the hearings, but plaintiffs allege none of them explain the high price of unleaded gasoline in the class area, and only further demonstrate that defendants engaged in a price-fixing conspiracy. Id. ¶¶ 75, 80–87. The lack of an

---

[21] R.L. Vallee argues that whether the legislative testimony is admissible as evidence of intent to conceal a conspiracy depends upon some initial pleading of facts to show the testimony's falsity, which it claims plaintiffs have not done. *See* R.L. Vallee's Reply at 18. However, plaintiffs have pled that, for various reasons, defendants' testimony does not provide an explanation for the high gas prices, which was the purpose of the legislative hearings. *See* Compl. ¶¶ 80–87. Additionally, plaintiffs' pleading of excessive profits undermines defendants' statement that they were losing money. Id. ¶ 63. The court deems that sufficient.

explanation for high gas prices is itself significant, and the lack of a rational explanation given the opportunity to present one even more so. In one federal case, the Second Circuit held that plaintiffs failed to plead additional facts beyond mere parallel conduct to plausibly suggest an agreement where defendants' "*en masse* flight from a collapsing market in which they had significant downside exposure[ ]made perfect business sense. . . . [A]bandoning bad investments was not just *a* rational business decision, but the *only* rational business decision." Mayor of Baltimore, 709 F.3d at 138 (italics and emphasis in original). Here, in contrast, there is no clear rational explanation for the high gas prices that would counter the inference of a price-fixing agreement as opposed to rational, legitimate, and independent parallel conduct.[22]

### iii. Allegations Concerning Barriers to Entry

Plaintiffs allege several so-called "barriers to entry" which, they claim, also suggest a price-fixing conspiracy. Most of these allegations, however, add nothing to their argument. They make vague reference to a need to obtain environmental permits, legal limitations on the number of gas stations in the class area, the cost and complexity of gasoline storage and operation of stations, and defendants' "threats" against anyone who attempts to open a competing gas station. However, they

---

[22] The court emphasizes that it is not placing a burden on defendants to produce an explanation for parallel pricing at the pleading stage. Rather, the court merely recognizes, as other courts have, that the existence or absence of an obvious alternative explanation for the parallelism that suggests independent conduct rather than an illegal agreement is an important factor. *See* In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 322–23 (3d Cir. 2010) (quoting Twombly, 550 U.S. at 567) ("allegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged"); In re Travel Agent Comm'n Antitrust Litig. ("Tam Travel"), 583 F.3d 896, 908–09 (6th Cir. 2009) (airlines' historical failures at independently cutting commission rates without prior agreements with other airlines did not suggest collusion, because defendants offered a "reasonable, alternative explanation": each airline could have reasonably calculated that a successful commission cut would yield greater net revenue); LaFlamme v. Societe Air France, 702 F. Supp. 2d 136, 151–52 (E.D.N.Y. 2010) ("rapidly rising jet fuel prices" provided an obvious independent explanation for the alleged parallel behavior); In re Graphics Processing Units Antitrust Litigation, 527 F.Supp.2d 1011, 1022 (N.D. Cal. 2007) (allegations of parallel conduct were equally consistent with conspiracy and lawful conduct where certain characteristic of chip industry provided "independent innocent explanation" for conduct); *Cf.* Interstate Circuit v. United States, 306 U.S. 208, 224 (1939) (defendant's letter provided evidence of conspiracy, particularly because defendants could offer no alternative reason for parallel pricing demands).

include no additional detail or facts explaining the nature of these allegations or how these operate to prevent entry into the market. Without more context, those allegations are simply insufficient.

Other alleged barriers to entry are more fact-specific, but do not suggest a price-fixing conspiracy in the class area. For example, plaintiffs allege that defendants have "frequently" acquired real property on which they imposed deed restrictions barring future use as gas stations to further limit competition or dilution of the market share. Id. ¶ 7. However, the only examples are actions solely by R.L. Vallee in Plainfield and St. Johnsbury, outside of the class area. Id. ¶¶ 52, 54. It is difficult to see how those particular activities, if true, support an inference of a conspiracy to fix prices between the four defendants in the class area.

Another allegation is that defendants misused Vermont environmental laws to obstruct the entry of low-cost gasoline providers and to extract unreasonable covenants that prevent or limit competition. Id. ¶ 7. Only two examples are provided. First, in 2010 R.L. Vallee opposed Walmart's bid to build a discount store in Franklin County until it was written into the permit that "there shall be no sale of gasoline for automobiles." Id. ¶ 50. Second, R.L. Vallee has partnered with Wesco since 2007 to oppose Costco's plans to build a filling station in Colchester, Vermont. Id. ¶ 51. However, it is perfectly reasonable for a business to try independently to discourage competitors; such conduct does not necessarily show a conspiracy. Furthermore, the Walmart opposition was action taken solely by R.L. Vallee, while the Costco opposition involved only two of the four defendants. The court deems these allegations to be of very limited persuasive value.[23]

### (3) Analysis

In determining whether plaintiffs have adequately pled facts from which a price-fixing conspiracy could be inferred, the court must examine the allegations in the complaint as a whole.

---

[23] Plaintiffs allege one other example involving a new filling station in Plainfield, outside of the class area. Id. ¶ 53. Because it is outside of the class area, it has no relevance to an alleged price-fixing conspiracy inside the class area.

Plaintiffs have alleged parallel pricing, as well as product and market structure factors demonstrating that the class area was conducive to a price-fixing conspiracy. Those allegations alone are insufficient because they merely demonstrate an oligopolistic market. However, plaintiffs also allege certain plus factors which suggest that the parallel conduct might have resulted from an agreement and is not merely consistent with independent action. The discrepancy between retail prices and terminal rack costs, the temporary price reductions before the legislative hearings at a time of rising costs, and the lack of a rational explanation for the pricing behavior at the legislative hearings, when considered together with the parallel pricing and market structure, suggest a price-fixing agreement.

Defendants claim that plaintiffs must identify the specific time, place, or person related to the conspiracy allegation. This is incorrect, even under the post-Twombly federal pleading standard. The Second Circuit has interpreted Twombly as not requiring such specificity where the claim of agreement rests on parallel conduct. *See* Starr, 592 F.3d at 325 (citing Twombly, 550 U.S. at 565 n.10); *see also* Allen v. Dairy Farmers of Am., Inc., 748 F. Supp. 2d 323, 333 n.2 (D. Vt. 2010). Instead, allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Starr, 592 F.3d at 322 (citing Twombly, 550 U.S. at 557). Examples of a parallel conduct allegation that would suffice under this standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." Id. (citing Twombly at 556 n.4).

Defendants, and particularly R.L. Vallee, also repeatedly point to footnote six in Vallee's December 11th reply memorandum, where Vallee cites nine federal antitrust cases that were,

31

according to Vallee, "dismissed at the pleading stage because they suffered from the same deficiency as Plaintiffs' Complaint: they failed to allege facts supporting the inference that an unlawful agreement among competitors to fix prices, rather than legitimate business behavior, was responsible for parallel market activity." R.L. Vallee's Reply at 9 n.6 (citing SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412 (4th Cir. 2015); Mayor of Baltimore, 709 F.3d 192; Insurance Brokerage, 618 F.3d 300; In re Travel Agent Comm'n Antitrust Litig. ("Tam Travel"), 583 F.3d 896 (6th Cir. 2009); Hu v. Huey, 325 Fed. Appx. 436 (7th Cir. 2009); Allen v. Dairy Farmers of America, Inc., 748 F. Supp. 2d 323 (D. Vt. 2010); LaFlamme v. Societe Air France, 702 F. Supp. 2d 136 (E.D.N.Y. 2010); In re Static Random Access Memory Antitrust Litigation, 580 F.Supp.2d 896 (N.D. Cal. 2008); In re Graphics Processing Units Antitrust Litigation, 527 F.Supp.2d 1011 (N.D. Cal. 2007)).

While those cases provide guidance as to what allegations can be used as "plus factors" from which an inference of a conspiracy can be drawn, they were all decided under the federal, post-Twombly pleading standard. Moreover, the cases are inconsistent and impossible to harmonize. In any case, each is fact-specific and provides no broad guidance here. For instance, while some of the cited cases observe that meetings between defendants must be alleged with some level of specificity in order to suggest a conspiracy, *see* SD3, 801 F.3d at 429–30; Mayor of Baltimore, 709 F.3d at 139–40; Tam Travel, 583 F.3d at 910–11; LaFlamme, 702 F. Supp. 2d at 147–48, an allegation of meetings is not strictly necessary to survive a 12(b)(6) motion, nor is it even necessary to allege a specific time or place of the conspiracy. *See* Starr, 592 F.3d at 325.

Defendants also point to pre-Twombly federal cases in an attempt to show that even under our lower pleading standard, plaintiffs have failed to adequately allege a conspiracy to fix prices. In Estate Construction. Co. v. Miller & Smith Holding Co., the Fourth Circuit held that dismissal

of an antritrust conspiracy complaint was appropriate where the plaintiffs failed to provide "any factual support" for their allegations of a conspiracy. 14 F.3d 213, 221 (4th Cir. 1994). The complaint there, however, was entirely conclusory, stating no facts and only legal conclusions. Id.[24]

Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985) also involved an entirely conclusory complaint. Though notice pleading was all that was required for a valid antitrust complaint in that case, "[n]evertheless, enough data must be pleaded so that each element of the alleged antitrust violation can be properly identified." Id. (quotations omitted). The complaint in Lombard's stated only a conclusory allegation that there was a conspiracy in violation of the Sherman Act, and Prince was the only defendant named. Id. "Thus not only are no facts alleged to demonstrate the conspiracy but the specific participants of the conspiracy are not even identified. Such pleading is inadequate to give the defendant fair notice of Lombard's claim." Id.[25]

---

[24] The complaint provided:

> Providence combined and/or conspired with the Miller & Smith defendants, Gordon V. Smith, Calloway, Conner, Jack B. Conner Associates, Inc. and others to restrain trade unreasonably in the real estate development business in the Washington, D.C. metropolitan area by combining and/or conspiring to deprive the Pattersons of The Property, cause The Property to be sold in foreclosure at a price that would leave the Pattersons with no assets, and otherwise to drive them and Estate Construction out of the real estate development business in the Washington, D.C. metropolitan area. The combination and/or conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market. The objects and conduct of the combination and/or conspiracy were illegal.

Estate Constr., 14 F.3d at 221 n.15.

[25] The relevant paragraphs of the complaint in Lombard's provide:

> 10. Upon information and belief, PRINCE, together with PRINCE dealers and others at this time unknown to LOMBARD'S, conspired to maintain the resale prices of the "Prince Precision Graphite," the "Prince J/R Pro" and the "Prince Magnesium Pro" tennis racquets and terminate price-cutters. In furtherance of that conspiracy, and in response to dealer complaints, PRINCE has prevented LOMBARD'S from making wholesale and mail order sales of the three (3) new tennis racquets by refusing to fill LOMBARD'S purchase orders for these new tennis racquets.

Defendants also point to In re Currency Conversion Fee Antitrust Litigation as an example of a sufficiently pled antitrust complaint under the pre-Twombly federal pleading standard. In that case, though the parallel conduct by MasterCard and VISA in establishing currency conversion fees was not enough by itself to infer an antitrust conspiracy, plaintiffs also alleged plus factors which prevented dismissal. 265 F. Supp. 2d 385, 418–19 (S.D.N.Y. 2003). Those plus factors included allegations that certain fees were against the defendants' economic self-interest absent collusion, a dual governance structure facilitated the conspiracy, and the actions of one organization's board were disseminated to members of both organizations. Id. (Thus, "each of the associations is a fishbowl and officers and board members are aware of what the other is doing, much more so than in the normal corporate environment.") Id. Another example of a sufficiently pled antitrust complaint is In re Mid-Atlantic Toyota Antitrust Litigation, 525 F.Supp. 1265, 1280–81 (D. Md. 1981), where the plaintiff "carefully documented a series of meetings . . . includ[ing] the persons in attendance . . . , the topics discussed, and the impact these meetings had on the alleged conspiracy . . . ."

Defendants are correct that plaintiffs' "plus factor" allegations in this case are not as strong as those in Currency Conversion or Mid-Atlantic. On the other hand, plaintiffs' allegations are not as "bare bones" as those offered in Estate Construction and Lombard's. Unlike Lombard's, which failed to specify the participants in the conspiracy, plaintiffs here specify the four named

---

11. Upon information and belief, PRINCE, together and with PRINCE dealers and others at this time unknown to LOMBARD'S, have attempted, and are now attempting, to prevent LOMBARD'S from making wholesale and mail order sales of the "Prince Precision Graphite," the "Prince J/R Pro" and the "Prince Magnesium Pro" tennis racquets not to achieve any legitimate business objectives, but for the sole purpose of unlawfully preventing LOMBARD'S from engaging in intrabrand price competition with other dealers in those same tennis racquets.

Lombard's, 753 F.2d at 975.

defendants as the participants. Furthermore, unlike the Estate Construction complaint which "lack[ed] completely any allegations of communications, meetings, or other means through which one might infer the existence of a conspiracy," plaintiffs here allege price increases at a time of declining costs, price changes immediately before legislative hearings to investigate high gas prices, and the lack of a rational explanation for the high gas prices. Considering those factors along with the allegations of parallel pricing behavior and a market structure and product that make price-fixing feasible, plaintiffs' complaint offers something more than a mere conclusory allegation of a price-fixing conspiracy.

In essence, defendants argue that because there may well be a perfectly legitimate explanation for all of the facts alleged by plaintiffs, the complaint is insufficient. The court concludes that this is not the law at the pleading stage. Instead, if the allegations could also be explained by a tacit agreement to fix prices, the complaint is sufficient. *See, e.g.*, Heritage, 137 Vt. at 430 (evidence compels neither inference of price-fixing nor "an inference of no agreement"); SD3, 801 F.3d at 425 ("[I]t is not our task at the motion-to-dismiss stage to determine whether a lawful alternative explanation appear[s] more likely from the facts of the complaint. Post-Twombly appellate courts have often been called upon to correct district courts that mistakenly engaged in this sort of premature weighing exercise in antitrust cases.") (internal citation omitted); Starr, 592 F.3d at 325 (allegations adequate at pleading stage if they "suggest" that an agreement was made).[26]

This is a motion to dismiss, based solely upon allegations. It could be that no evidence exists that reasonably supports the allegations. It is possible that discovery will turn up insufficient

---

[26] As one treatise notes, Twombly cannot mean "that the plaintiff must disprove all nonconspiratorial explanations for the defendants' conduct," even at the summary judgment stage. P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law § 14.03[B] at 14-25 (4th ed. 2015 supp.).

evidence to support plaintiffs' claims, and the case will not survive summary judgment. However, that is not the question to be resolved here. Starr, 592 F.3d at 329 (Newman, J., concurring) ("Even in those contexts in which an allegation of parallel conduct will not suffice to take an antitrust plaintiff's case to the jury, it will sometimes suffice to overcome a motion to dismiss and permit some discovery . . . ."). Plaintiffs' allegations of parallel conduct and plus factors are enough to survive a 12(b)(6) motion to dismiss under Vermont's "exceedingly low" pleading standard.

## V.     Unjust Enrichment

Unjust enrichment rests on the principle that one should "not be allowed to enrich himself unjustly at the expense of another." Shattuck v. Peck, 2013 VT 1, ¶ 11, 193 Vt. 123. "[T]he inquiry is whether, in light of the totality of circumstances, it is against equity and good conscience to allow [a party] to retain what is sought to be recovered. . . . It must be a realistic determination based on a broad view of the human setting involved." Id. (quoting Weed v. Weed, 2008 VT 121, ¶ 17, 185 Vt. 83). Thus, unjust enrichment is present only if: "(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." Kellogg v. Shushereba, 2013 VT 76, ¶ 31, 194 Vt. 446, 463 (quoting Center v. Mad River Corp., 151 Vt. 408, 412 (1989)) (alterations in original).

Plaintiffs allege that during the class period, defendants' price-fixing conspiracy resulted in plaintiffs paying artificially inflated prices for unleaded gasoline, and that defendants have retained the benefit of those excess profits. *See* Compl. ¶¶ 4, 7, 10, 16, 34, 56–75, 106–108. Defendants contend that plaintiffs' unjust enrichment claim fails because there is no allegation that defendants did not "compensate" or "pay" plaintiffs for the benefit they received, "i.e., that [d]efendants did not give [p]laintiffs gasoline in exchange for money." R.L. Vallee's Mot. to

Dismiss at 31. To support this argument, defendants quote <u>Ray Reilly's Tire Mart, Inc. v. F.P. Elnicki, Inc.</u>, 149 Vt. 37, 39 (1987), which states that "[t]he retention of a benefit is not unjust where defendants have paid for it."

The issue here, however, is whether the amount plaintiffs paid for the product was unreasonably high and thus whether defendants obtained a greater benefit than the value of the product. *See, e.g.*, <u>In re Processed Egg Products Antitrust Litig.</u>, 851 F. Supp. 2d 867, 927 (E.D. Pa. 2012) (plaintiffs sufficiently alleged that purchasers had conferred benefit on defendants since any purchase of eggs at artificially inflated prices stemming from price-fixing conspiracy "allowed [d]efendants to obtain the benefit of 'increased revenues and profits from their sales of eggs'"); <u>In re TFT-LCD (Flat Panel) Antitrust Litig.</u>, 599 F. Supp. 2d 1179, 1190 (N.D. Cal. 2009) (plaintiffs alleged that they conferred benefit on defendants by paying higher prices for LCD products than they would have in absence of alleged price-fixing conspiracy).

Defendants also claim that the unjust enrichment claim fails because plaintiffs have failed to adequately allege a price-fixing conspiracy. In light of the court's resolution of the price-fixing claims above, the court rejects defendants' argument. *See generally* D. Karon, <u>Undoing the Otherwise Perfect Crime - Applying Unjust Enrichment to Consumer Price-Fixing Claims</u>, 108 W. Va. L. Rev. 395, 431 (2005) (arguing that unjust enrichment always has applied to situations like consumer price-fixing claims).

However, the statute of limitations issue addressed above applies equally to the unjust enrichment claim. *See* <u>Stankiewicz v. Estate of LaRose</u>, 151 Vt. 453, 456 (1989) (six-year statute of limitations under 12 V.S.A. § 511 applies to unjust enrichment claim). Plaintiffs may not proceed on any unjust enrichment which may have occurred before June 22, 2009.

<u>Order</u>

Defendants' motions to dismiss are granted in part and denied in part. The motions are granted on statute of limitations grounds with respect to the period before June 22, 2009. They are denied in all other respects. The parties are directed to submit a proposed discovery schedule by May 24.

Dated at Burlington this 7th day of May, 2016.

_____
Helen M. Toor
Superior Court Judge