NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

JUL 21 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| FLEXTRONICS INTERNATIONAL USA, INC., | No.    22-15231 |
| Plaintiff-Appellant, | D.C. Nos.    5:19-cv-00078-EJD<br>5:18-cv-00198-EJD |
| v. | |
| PANASONIC HOLDINGS CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA, | MEMORANDUM* |
| Defendants-Appellees, | |
| and | |
| MURATA MANUFACTURING CO., LTD.; MURATA ELECTRONICS NORTH AMERICA, INC.; MURATA POWER SOLUTIONS, INC.; TAIYO YUDEN CO., LTD.; TAIYO YUDEN (U.S.A.) INC.; TDK CORPORATION; TDK-EPC CORPORATION; TDK CORPORATION OF AMERICA; TDK U.S.A. CORPORATION; TOKIN CORPORATION; TOKIN AMERICA, INC.; SAITAMA MURATA MANUFACTURING CO., LTD.; SAGAMI ELEC CO., LTD.; SAGAMI AMERICA LTD.; SUMIDA CORP.; SUMIDA ELECTRIC CO., LTD; SUMIDA | |

---

        *    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

AMERICA COMPONENTS, INC.,

Defendants.

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted February 16, 2023
San Francisco, California

Before:  S.R. THOMAS,** NGUYEN, and KOH, Circuit Judges.

Flextronics International USA, Inc., and its affiliates (collectively, "Flex")
appeal the district court's dismissal with prejudice of its Fourth Amended
Complaint against Panasonic Holdings Corp. and Panasonic Corp. of North
America (collectively, "Panasonic").[1]  Flex alleges that, from January 1, 2003 to
December 31, 2017 ("Conspiracy Period"), Panasonic and six other inductor
producers (collectively, "Defendants")[2] conspired to fix supra-competitive prices

---

**  Pursuant to General Order 3.2(h), Judge S.R. Thomas has been drawn to replace Judge Wardlaw in this matter.  Judge S.R. Thomas has reviewed the briefs and the record and viewed the recording of the oral argument hearing in this case.

[1] After we heard oral argument and took the case under submission, the parties stipulated to the dismissal of Sumida Corp.; Sumida Electric Co., Ltd.; and Sumida America Components, Inc. (collectively, "Sumida") Sagami Elec Co., Ltd. and Sagami America Ltd. (collectively, "Sagami").  Panasonic is the only appellee that remains.

[2] The four other Defendants include Murata Electronics North America, Inc.; Murata Power Solutions, Inc.; and Saitama Murata Manufacturing Co., Ltd. (collectively "Murata"); Taiyo Yuden Co., Ltd. and Taiyo Yuden (U.S.A.) Inc.

for inductors in violation of the Sherman Act, 15 U.S.C. § 1. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

1. The district court erred in concluding that Flex failed to adequately allege parallel pricing. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999) ("Parallel pricing is a relevant factor to be considered along with the evidence as a whole; if there are sufficient other 'plus' factors, an inference of conspiracy can be reasonable."). Parallel pricing need not be identical so long as it is similar and reasonably contemporaneous. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).

Flex's allegation of parallel pricing is based on an analysis of its own purchases of $750 million in inductors from Defendants during the Conspiracy Period. Dr. Russell Lamb conducted a statistical price analysis of Flex's purchases from Murata, Taiyo Yuden, and TDK, and found that the three companies' prices for certain inductors always moved in parallel, and prices remained stubbornly stable throughout the Conspiracy Period. Although Flex acknowledges that it did not purchase enough obviously comparable products over a long enough time frame from Panasonic, Sagami, Sumida, or Tokin to permit a statistical analysis, Flex provides factual allegations supporting a reasonable inference that

(collectively, "Taiyo Yuden"); TDK Corp.; TDK-EPC Corp.; TDK Corp. of America; and TDK U.S.A. Corp. (collectively, "TDK"); and Tokin Corp. and Tokin America, Inc. (collectively, "Tokin").

3

Panasonic's, Sagami's, Sumida's, and Tokin's prices moved in parallel with Murata's, Taiyo Yuden's, and TDK's prices. For example, Flex alleges that Panasonic and Sagami's monthly median prices for certain popular inductors exhibited similar trend lines over time and were nearly identical by 2012. Flex also identifies fourteen specific examples of price comparisons in which Panasonic, Sagami, Sumida, and Tokin had substantially similar prices to Murata, Taiyo Yuden, and TDK for the same type of inductor during a particular month. Finally, Flex alleges that when TDK submitted proposed prices to an original equipment manufacturer customer in December 2012, January 2013, and July 2013, TDK knew Panasonic's price and pricing strategy for similar inductors such that in all three cases, TDK never submitted a price lower than Panasonic.

Construing the pleadings in Flex's favor, this alleged conduct is sufficient to plausibly allege parallel pricing. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (internal citation omitted)).

2.      When considering Flex's plus factors, the district court erred two ways. First, it erred by focusing only on Defendants' participation in the Japan Electronics and Information Technology Industries Association ("JEITA") meetings and failing to consider the Fourth Amended Complaint holistically. The

4

correct analysis requires us to "consider each purported plus factor in turn and cumulatively to determine whether [Flex] ha[s] alleged nonconclusory facts sufficient to state a claim under § 1." *Musical Instruments*, 798 F.3d at 1194; *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (explaining that "courts must consider the complaint in its entirety"). Second, the district court erred by requiring Flex to plead facts "tending to exclude the possibility that defendants acted independently." However, the requirement that a plaintiff offer "'evidence that tends to exclude the possibility' of lawful independent conduct" is more appropriate at summary judgment, rather than on a motion to dismiss. *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1118 (9th Cir. 2022) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). The proper standard is that which "applies to all § 1 complaints: a plaintiff must *plausibly* allege an agreement that is unreasonable 'per se' or under the 'rule of reason.'" *Id.* (emphasis added) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)).

Flex adequately alleges five plus factors that weigh in favor of finding conspiracy.

A. Flex alleges instances which are plausibly understood as invitations to collude in a price-fixing conspiracy. For example, at a November 2008 meeting, the then-chairman of JEITA stated to the Passive Components Committee

5

("PCC")—a committee covering capacitors, inductors, and resistors—that "it is not the time to reduce prices." Similarly, a Panasonic employee noted ongoing "[p]rice correction (price increase / price reduction suppression efforts)" at a June 2010 PCC meeting and that "[a]t consumer PCC, price reductions were suppressed while assessing competitor prices." Finally, in April 2014, an employee of Taiyo Yuden contacted representatives of the other Defendants asking them to "decide the [Consumption Factor ("CF")] value of the inductor" and proposing CF values for two types of inductors and requesting "verification" of the proposed values. The CF is a value formulated by the World Trade Statistics group using data collected by JEITA from its members, which is used to calculate "average sales price by region using estimated consumption and reported total sales." JEITA's policy prohibited member companies from discussing proposed CFs with one another. A representative from Tokin responded to Taiyo Yuden's request that he was not sure what the CF would be, but he would follow TDK's recommendation.

B. Flex also alleges facts reflecting consciousness of guilt or acknowledgements by co-conspirators that their conduct is anticompetitive. For example, in 2012, a Panasonic employee stated that "there was a lot of material, such as which customers are increasing, which we called information exchange that would now be acknowledged as a compliance violation." The term "compliance violation" refers to Panasonic's fair-trade compliance policy, which

6

prohibits "[a]greements and exchanges of information with competitors regarding prices, quantity, and other competition-related matters." Moreover, in February 2005, a United Chemi-Con employee sent notes from a JEITA meeting to his superiors warning that "In North America, these sorts of meetings are completely prohibited, so please take utmost care in the handling of the attached memo." Similarly, the President of KOA, who served as a chair of the PCC during the Conspiracy Period, acknowledged that certain aspects of JEITA meetings "can put the company at risk of being deemed as taking part in antitrust activities."

C. Flex alleges that Panasonic participated in similar and overlapping conspiracies to fix the prices of capacitors and resistors. *See In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 53 (9th Cir. 2022) (noting that participation in other conspiracies is a plus factor "particularly when the prior conspiracy and the alleged subsequent conspiracy have factual overlap or involve the same actors"). Panasonic applied for amnesty from the United States Department of Justice ("DOJ") in connection with agreements with its competitors to inflate the price of both capacitors and resistors. The conspiracy period for the capacitors conspiracy—September 1997 to January 2014—overlaps with the inductors Conspiracy Period. Indeed, Flex alleges that the meetings for resistors and capacitors were scheduled and held in tandem with the meetings for inductors, and information for all three passive components was

often distributed in a single communication.  Moreover, capacitors, inductors, and resistors were treated similarly by Defendants and their employees.  For example, a Tokin employee who was indicted for the capacitors conspiracy participated in and performed acts—such as information exchanges—for inductors as well as capacitors.

D.    Flex alleges that the exchange of firm-specific, forward-looking, and confidential information at JEITA meetings facilitated the price-fixing conspiracy.  Although "mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement," *Musical Instruments*, 798 F.3d at 1196, the exchange of information may be considered a plus factor that supports a finding of conspiracy.  *See United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969) (holding that the exchange of customer-specific and confidential price information is sufficient to establish conspiracy to survive a motion to dismiss).  The Federal Trade Commission and the DOJ have acknowledged that, other things being equal, the exchange of certain types of information are more likely to raise competitive concern: (1) "information relating to price, output, costs, or strategic planning"; (2) "information on current operating and future business plans"; and (3) "individual company data" rather than "aggregated data that does not permit recipients to identify individual firm data."  Federal Trade Commission & U.S. Department of Justice, *Antitrust*

*Guidelines for Collaborations Among Competitors* 15–16 (April 2000).  The information exchanges in this case have all three qualities.

Moreover, Flex identifies discussions at JEITA and PCC meetings that "are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."  *Musical Instruments*, 798 F.3d at 1194.  For example, at a May 2007 PCC meeting, attendees discussed customer "cost-down" requests, or requests by customers for price decreases.  Similarly, at the meeting, Murata and Sagami explained to their competitors their increases in revenue from 2005 to 2006 and forecasted revenue increases in 2007.  Finally, Sagami told its competitors that it was "struggling in handling the steep rises in the price of materials and the environment."

Panasonic argues that this case should be controlled by *Citric Acid* and *Musical Instruments*, but those cases are distinguishable.  *Citric Acid* was decided at summary judgment, which applies a higher standard than the plausibility standard on a motion to dismiss.  *See* 191 F.3d at 1094.  Unlike this case, the information exchanges at issue in *Citric Acid* involved aggregated, rather than firm-specific, data.  *See id.* at 1098–99.  *Musical Instruments* is distinguishable because the information exchanges occurred during "open panel discussions attended by many people" at biannual trade shows, which were open to thousands of members and the media.  798 F.3d at 1191.  Moreover, in *Musical Instruments*,

9

we found that participation in trade shows and the adoption of minimum advertised price policies over several years was consistent with the defendants' self-interest. *Id.* at 1196–97. By contrast, Flex alleges that the exchange of firm-specific and forward-looking information in this case occurred at private meetings between nine corporate groups and facilitated parallel pricing. Unlike *Musical Instruments*, Flex also alleges sufficient facts suggesting that the information exchanges and discussions at JEITA meetings went against Defendants' self-interest.

E.     Flex alleges that the characteristics of the inductors market make it conducive to conspiracy. The inductors market is highly concentrated. *See DRAM*, 28 F.4th at 52 (noting that "[e]xtreme market concentration may suggest conspiracy, particularly when accompanied by other plausible plus factor allegations"). For example, Murata, Panasonic, Sumida, Taiyo Yuden, and TDK controlled over 80% of the market for inductors in 2004 and over 66% in 2016. Flex estimates that when Sagami and Tokin are included, Defendants controlled at least 73% of the market in 2016. Inductors are an interchangeable commodity, such that product differentiation between two companies for the same type of inductor is "minimal." There are high barriers to entry for new inductors producers. Inductors are demand inelastic. Finally, the prices of inductors have remained stable from 2008 to 2013 despite a decline in demand.

*     *     *

10

Considering Flex's Fourth Amended Complaint as a whole and applying the plausibility standard, we hold that Flex's factual allegations of parallel pricing and plus factors are sufficient to nudge its claim of a price-fixing conspiracy "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

**REVERSED.**